AMERICAN INDEPENDENT PARTY v SECRETARY OF STATE

Docket No. 58834. Decided September 1, 1976. Opinion filed November 23, 1976. On application by defendants for leave to appeal the Supreme Court, in lieu of granting leave to appeal, reversed the decision of the Court of Appeals.

The American Independent Party (Morse faction) filed a complaint for mandamus in the Court of Appeals against the Secretary of State and the Director of Elections seeking an order to place their faction's slate of candidates on the 1976 general election ballot, or to place both their slate and the slate presented by the American Independent Party (Chapman faction) on the ballot. The Court of Appeals, Cavanagh, P. J., and Bronson and D. E. Holbrook, Jr., JJ., ordered the defendants to include both factions on the 1976 general election ballot (Docket No. 29722). Defendants apply for leave to appeal. *Held:*

The American Independent Party is entitled to a column on the 1976 general election ballot, but because of intervening changes in the election code, case law requiring the placing of more than one slate of candidates for a political party on the general election ballot when there is a schism does not apply. The candidates placed in the column to which the party is entitled are those certified by the chairman and the secretary of the state convention. The Director of Elections correctly left to the American Independent Party the resolution of the intraparty dispute.

The order of the Court of Appeals is reversed and the complaint for mandamus is dismissed.

Justice Levin dissented on the ground that leave to appeal should have been denied. Alternatively, the case should have

REFERENCES FOR POINTS IN HEADNOTES

[1] 26 Am Jur 2d, Elections § 208.

[2] 25 Am Jur 2d, Elections § 175

[3, 6] 25 Am Jur 2d, Elections § 126.

Determination of controversies within political party. 169 ALR 1281.

[4, 5] 26 Am Jur 2d, Elections § 215.

[7, 8] 5 Am Jur 2d, Appeal and Error § 901.

[9] 26 Am Jur 2d, Elections § 220.

been remanded for an evidentiary hearing regarding the nature of the dispute and determination whether, in the application of objective criteria, the court can decide which group was rightfully in control of the party, and for entry of an appropriate decree securing the right of the American Independent Party to have candidates for all offices for which nominations were made to appear on the ballot. The doctrine of judicial abstention in favor of resolution by internal party processes is premised on the assumption that those processes are available and that a resolution consistent with affirmation of the fundamental political right of access to the ballot can be obtained. In this case it appears that because the dispute arose at the highest level of the party it cannot be resolved through internal party processes. It is, therefore, incumbent upon the Supreme Court to provide a meaningful remedy so that a minority faction does not preclude exercise by the majority of their electoral rights. A decision with "opinion to follow" does not comply with either the letter or the spirit of the constitutional requirement that a decision of the Supreme Court contain a statement of the reasons for decision. The opinion-writing process is an important part of the making of a decision and constitutes a crucial check on judicial oversight, error, and arbitrariness.

Remanded for further proceedings.

## Opinion of the Court

1. Elections—Political Parties—Slate of Candidates.

   The Michigan Election Law does not require the placing of more than one slate of candidates for each political party on the general election ballot (MCL 168.685; MSA 6.1685).

2. Elections—Political Parties—Slates of Candidates.

   The Legislature has provided the means by which new political parties may obtain a column on the general election ballot; those candidates of a qualified political party placed in the party's column are the candidates certified by the chairman and the secretary of the state convention of the party (MCL 168.685; MSA 6.1685).

3. Elections—Political Parties—Conventions—Intra-Party Disputes.

   The convention of a political party is the proper forum for determining intraparty disputes; the political process should function free from judicial supervision unless infringement of constitutional rights is alleged.

DISSENTING OPINION

LEVIN, J.

4. ELECTIONS—ACCESS TO BALLOT—FUNDAMENTAL RIGHTS.

*Access to the ballot is a fundamental right secured to the people by Federal and state Constitutions, and by statute.*

5. ELECTIONS—BALLOT—COURTS—JUSTICIABLE CONTROVERSY.

*A claim that election officials have declined to include on the ballot the name of a person duly nominated by a qualified political party presents a justiciable controversy which the courts have an obligation to adjudicate in discharge of their responsibility to protect the rights of political parties, candidates, and electors to have access to the ballot.*

6. ELECTIONS—BALLOT—COURTS—INTRA-PARTY DISPUTE.

*It is incumbent upon the Supreme Court to provide a meaningful remedy so that a minority faction of a political party does not preclude exercise by the majority of their electoral rights where internal party processes to resolve the dispute are not available because the dispute arose at the highest state level of the party.*

7. COURTS—APPEAL AND ERROR—DECISION OF THE COURT.

*A decision of the Supreme Court issued in an order with "opinion to follow" does not comply with either the letter or spirit of the constitutional requirement that a decision of the Supreme Court contain a statement of the reasons for decision (Const 1963, art 6, § 6).*

8. COURTS—APPEAL AND ERROR—OPINIONS.

*Opinion writing is an important part of the process of making a decision in the Supreme Court, constituting a crucial check on judicial oversight, error, and arbitrariness; to decide before engaging in opinion writing is to ignore the constitutional requirement and the importance of the opinion-writing process which may necessitate a search for* post facto *reasons and rationalizations to justify the decision already made (Const 1963, art 6, § 6).*

9. MANDAMUS—ELECTIONS—BALLOT.

*An action for mandamus lies to secure the right of a political party, candidate or electors to have a candidate's name appear on the ballot; no right is more precious in a free country than that of having a voice in the election of those who make the laws.*

*Vandervoort, Cooke, McFee, Christ, Carpenter & Fisher* (by *Paul R. Levy)* for plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Solomon H. Bienenfeld,* First Assistant, and *Mark E. Blumer,* Assistant Attorney General, for defendants.

## ORDER

Entered September 1, 1976.—REPORTER.

On order of the Court, defendants-appellants' emergency application for leave to appeal the August 25, 1976 order of the Court of Appeals is considered and, pursuant to GCR 1963, 853.2(4), in lieu of granting leave to appeal, IT IS HEREBY ORDERED that the Court of Appeals is REVERSED and the plaintiffs' complaint for mandamus is DISMISSED. This order is issued on an emergent basis to enable defendants to prepare ballots on time for the forthcoming election. Opinion to follow.

LEVIN, J., dissents for the reason that an order of the Court of Appeals should not be modified until this Court can explain the basis for its decision.

KAVANAGH, C. J., not participating.

PER CURIAM. The American Independent Party is entitled to a column on the 1976 general election ballot because of the vote its principal candidate received in the 1974 general election. MCLA 168.685; MSA 6.1685. On March 6, 1976, the State Central Committee, chaired by Vern G. Morse, called the "fall" state convention. MCLA 168.598; MSA 6.1598. That same day a faction of the Amer-

ican Independent Party headed by Josephine
Chapman split, formed its own State Central Com-
mittee, and called its own state convention. This
faction apparently considered itself entitled to the
name "American Independent Party" and made no
attempt to qualify as a new party under MCLA
168.685.

Each faction held a convention, nominated can-
didates for state offices for the 1976 general elec-
tion ballot, and presented its slate to the State
Director of Elections under the vignette and name
of the American Independent Party of the State of
Michigan. The director advised each that he would
accept *an* American Independent Party slate certi-
fied by both chairmen.

Federal and state litigation ensued. The Chap-
man faction sought relief in Federal district court
and its complaint was dismissed. The Morse fac-
tion filed a complaint for mandamus in the Court
of Appeals. On August 25, 1976, that Court or-
dered the Secretary of State and Director of Elec-
tions to include both factions on the 1976 general
election ballot "under such names and vignettes as
those parties shall respectively certify". The Court
of Appeals concluded that our decisions in *Shields
v Jacob,* 88 Mich 164; 50 NW 105 (1891), and
*Stephenson v Boards of Election Commissioners,*
118 Mich 396; 76 NW 914 (1898), were controlling
because of the Legislature's failure to clarify the
election code with regard to party schisms. *Shields*
held and *Stephenson* affirmed that:

"The petition shows that the call for a convention of
the Democratic party of the city of Detroit resulted in
two nominating conventions; and we are of opinion that
each of the tickets nominated at such conventions,
containing the names of the persons nominated by such
conventions, with the vignette and heading, if any is

furnished by the committee of such conventions, should
be printed upon the ballot. We do not consider that it is
the province of the board of election commissioners to
determine which convention represented the regular
nominating convention of the party; but that it is the
duty of said board to print and place upon the ballot
the names of the candidates certified to them by the
committee of either branch of the party represented by
the two conventions held to nominate city officers, and
that the names so certified to them in each list shall be
embraced in the ticket so printed; and that it is their
duty, further, if the same name of a party shall be
certified by each of two committees, that the name so
certified shall be printed without further addition or
distinctive designation than such as is contained in the
certificates furnished." 88 Mich 164, 169–170.

We hold that because of intervening changes in
the election code, neither *Shields* nor *Stephenson*
requires the placing of more than one slate of
candidates for each political party on the general
election ballot.

At the time of *Shields,* the election code set
forth minimal requirements for placement on the
general election ballot:

(1) the candidate must have been "nominated by
the regularly called conventions of any party",

(2) the name must have been timely "for-
ward[ed] [by the state, district or county committee
of each political party] to the * * * board of elec-
tion commissioners of each county * * * ". 1891
PA 190, § 10.

The same qualifications existed at the time of
*Stephenson,* except that 1895 PA 17 and 1895 PA
271 further provided that no individual could be
the nominee of more than one party for the same
political office.

After *Shields* and *Stephenson,* however, the Leg-
islature added the requirement that the vignette

and names of candidates of a new political party
be certified to the Secretary of State by the party's
state central committee. 1929 CL 3061. More im-
portantly, in 1939 PA 262, the Legislature added
the petition requirement for placement on the
ballot of candidates and vignettes of new parties
and the still extant vote-performance requirement
for existing parties. At the time *Shields* and *Ste-
phenson* were decided, the Legislature had made
no attempt to define how political parties qualify
for ballot status.

What is clear from the history of statutory
provisions governing elections and political parties
is that the election code in 1976 bears little resem-
blance to the statutes in effect in the late nine-
teenth century. The Legislature has provided the
means by which new parties may obtain a place
and old parties may continue on the ballot. Only
one American Independent Party has qualified for
*a* column. Those placed in that column are the
candidates certified by the chairman and the secre-
tary of the state convention.

The facts of this case illustrate the soundness of
the legislative decision. As Justice White said for
the United States Supreme Court:

"The general election ballot is reserved for major
struggles; it is not a forum for continuing intraparty
feuds." *Storer v Brown,* 415 US 724, 735; 94 S Ct 1274;
39 L Ed 2d 714 (1974),

and:

"It is too plain for argument, and it is not contested
here, that the State may limit each political party to
one candidate for each office on the ballot and may
insist that intraparty competition be settled before the
general election by primary election or by party conven-

tion." *American Party of Texas v White,* 415 US 767, 781; 94 S Ct 1296; 39 L Ed 2d 744 (1974).

Earlier, in speaking of delegate disputes in the National Democratic Party, the Court affirmed the principle that "the convention itself is the proper forum for determining intraparty disputes", and that "the political processes" should "function free from judicial supervision" unless infringement of constitutional rights is alleged. *O'Brien v Brown,* 409 US 1, 4, 5; 92 S Ct 2718; 34 L Ed 2d 1 (1972). See also, *Cousins v Wigoda,* 419 US 477; 95 S Ct 541; 42 L Ed 2d 595 (1975).

The Director of Elections correctly left to the American Independent Party the resolution of the intraparty dispute.

In lieu of leave to appeal, pursuant to GCR 1963, 853.2(4), we reverse the order of the Court of Appeals and dismiss the complaint for mandamus. No costs, a public question.

WILLIAMS, COLEMAN, FITZGERALD, LINDEMER, and RYAN, JJ., concurred.

KAVANAGH, C. J., took no part in the decision of this case.

LEVIN, J. *(dissenting).* The American Independent Party of Michigan (AIP) qualified to have the names of its candidates appear on the 1976 general election ballot.

An intraparty dispute arose and the adherents of the opposing groups attended separate conventions. Each convention nominated candidates for the general election and their names were certified to the Secretary of State. The Director of Elections responded that unless the AIP furnished a single slate he would refuse to certify any candidates.

The Court of Appeals, following early decisions of this Court, directed that both slates appear on the ballot. This Court reversed with "opinion to follow".

The Director of Elections advised that the names of the persons nominated at the separate conventions would appear on the ballot to the extent there was no conflict between the slates. The names of AIP candidates for some congressional seats, the 8-year term for the Supreme Court and other offices appeared on the ballot. Because of conflict between the slates, the ballot did not contain the name of an AIP nominee for President of the United States, United States Senator, member of the State Board of Education and Trustee of Michigan State University.

In today's opinion, the Court declares that because of intervening changes in the election law the precedents relied on by the Court of Appeals do not "require" the placing of more than one slate of candidates for a political party on the ballot. The Court states that " 'the political processes' should 'function free from judicial supervision' unless infringement of constitutional rights is alleged", and that the Director of Elections "correctly left to the American Independent Party the resolution of the intraparty dispute".

Leave to appeal should have been denied. Alternatively, the case should have been remanded for an evidentiary hearing regarding the nature of the dispute and determination whether, in the application of objective criteria, the court can decide which group was rightfully in control of the party, and for entry of an appropriate decree securing the right of the AIP to have candidates for all offices for which nominations were made appear on the ballot.

Access to the ballot is a fundamental right secured to the people by the Federal and state Constitutions and by statute.

The AIP, its candidates, and electors desiring to vote for them were entitled to have the names of the party's candidates appear on the ballot.

A claim that election officials have declined to include on the ballot the name of a person duly nominated by a qualified political party presents a justiciable controversy which the courts have an obligation to adjudicate in discharge of their responsibility to protect the rights of parties, candidates and electors to have access to the ballot. The doctrine of judicial abstention in favor of resolution by intraparty processes is premised on the assumption that those processes are available and that a resolution consistent with affirmation of this fundamental political right can be obtained.

In this case, it appears that because the dispute arose at the highest state level of the party (see fn 14 and accompanying text) it cannot be resolved through internal processes of the party. It is, therefore, incumbent on this Court to provide a meaningful remedy so that a minority faction does not preclude exercise by the majority of their electoral rights.

Further, a decision with "opinion to follow" does not comply with either the letter or spirit of the constitutional requirement that a decision of this Court contain a statement of the reasons for decision.

I

The facts were not developed at a hearing and, therefore, the nature of the dispute does not adequately appear on the record.

It appears from the complaints and other documents filed in the Federal and state court actions and from documents filed with the Director of Elections that Vern Morse was the Chairman of the AIP elected, as contemplated by the statute,[1] by the state central committee of the party. A dispute arose. The adherents of the so-called Chapman faction[2] claim that Josephine Chapman was thereafter elected chairman, presumably by the state central committee, replacing Morse.

Morse and Chapman each issued calls for state conventions of the party, and separate conventions were held.

Josephine Chapman as "state chairman" submitted slates of candidates and presidential electors to the Secretary of State on May 17, 1976. On May 24th, Vern Morse, also as "state chairman," submitted separate slates. The Director of Elections refused to accept the several slates and advised Chapman and Morse on June 25th that he would accept only a certification of nominees which they both signed. He subsequently modified his position and permitted the candidates for those offices not in intraparty dispute to appear on the ballot.

Chapman commenced an action in the United States District Court on July 1st in the name of the AIP.[3] The District Court, in dismissing the complaint on August 25th, held that requiring Morse and Chapman to agree on a single slate of nominees was not a deprivation of the Federal constitutional right of access to the ballot. There was no appeal.

---

[1] MCLA 168.597; MSA 6.1597.

[2] The terms "faction" and "schism" are conclusory, they color the analysis and tend to beg the question whether there is a dominant group rightfully in control of the AIP.

[3] The action sought a declaration that the AIP was "entitled to list both slates of candidates on the general election ballot".

Morse was added as a party on motion of the Secretary of State.

Morse commenced this state court action in the name of the AIP on August 9th in the Court of Appeals as an original action for mandamus against a state officer.[4] Relying on *Stephenson v Boards of Election Commissioners,* 118 Mich 396; 76 NW 914 (1898), and *Shields v Jacob,* 88 Mich 164; 50 NW 105 (1891), the Court of Appeals on August 25th directed that both slates be printed on the November ballot.[5]

This Court on September 1st reversed and directed that the complaint for mandamus be dismissed.[6] Our order did not explain the basis for decision stating that it was "issued on an emergent basis to enable defendants to prepare ballots on time for the forthcoming election. Opinion to follow." I dissented "for the reason that an order of the Court of Appeals should not be modified until this Court can explain the basis for its decision".

---

[4] GCR 1963, 714.1.

[5] The Court's order of August 25 directed that Chapman be joined as a party plaintiff.

Morse's complaint sought inclusion of only the Morse slate, not both slates.

The court's unpublished order provided: "pursuant to GCR 1963, 816.2(2)(g), that defendants include on the ballot for the November, 1976 general election both the American Independent Party (Morse-Smith faction) and the American Independent Party (Chapman-Kroes faction) under such names and vignettes as those parties shall respectively certify to the Secretary of State or his duly designated agent. *Stephenson v Boards of Election Commissioners,* 118 Mich 396 (1898), *Shields v Jacob,* 88 Mich 164 (1891). The continuing validity of those decisions follows from the lack 'of definitive clarification of the election code with respect to such party schisms in the intervening 85 years. *Groesbeck v State Board of Canvassers,* 251 Mich 286 [232 NW 387] (1930); *Knapp v Palmer,* 324 Mich 694 [37 NW2d 679] (1949); *Groth v Stillson,* 20 Mich App 704 [174 NW2d 596] (1969)."

[6] Our order entered pursuant to an application for bypass filed August 20th by the Attorney General. Counsel for Chapman filed a motion for stay of this Court's order with the Supreme Court of the United States, which was denied by Mr. Justice Stewart on September 22nd.

## II

Claims concerning the right of access to the ballot are justiciable.

At one time political parties were regarded as private associations not subject to judicial control. Subsequently, the organization of political parties and the nomination process came to be regulated by statute, and the courts entertained actions asserting that statutory requirements had not been observed. Later it was perceived that party organization and the nomination process concern the fundamental political right of access to the ballot and that the judiciary has a responsibility to protect this basic constitutional right. These developments accompanied expanded views of the judicial power to review the actions of private associations affecting basic rights.[7]

The argument that the political question doctrine precludes judicial consideration of an action

---

[7] *See,* Comment, *Political Parties, Courts, and the Political Question Doctrine: New Developments,* 52 Ore L Rev 269 (1973); Comment, *Judicial Intervention in Political Party Disputes: The Political Thicket Reconsidered,* 22 UCLA L Rev 622 (1975); Note, *Judicial Intervention in The Presidential Candidate Selection Process: One Step Backwards,* 47 NYU L Rev 1184 (1972); Anno: *Determination of Controversies within Political Party,* 169 ALR 1281; *Developments in the Law—Judicial Control of Actions of Private Associations,* 76 Harv L Rev 983 (1963).

"In cases of factional party fights it is sometimes necessary for the courts to pass upon the regularity of nominations in order that a ticket may be made up; but in determining which of two sets of nominees of a split political convention are entitled to have their names placed on the official ballot as the party nominees the inquiry of the court should not extend to an examination of political methods further than to ascertain the identity of the regular party convention." 29 CJS, Elections, § 88, p 218.

"Where the matter in dispute is controlled by legislation, and the question is whether there has been a violation of a statute, or where otherwise a clear legal right is shown, controversies within a political party are subject to judicial hearing and determination. Under such circumstances the courts will take jurisdiction of controversies concerning the membership or status of committees, party organization, or nomination for public office. In such a case, however, the court will extend its inquiry only so far as is necessary to determine which

asserting that the right of access to the ballot has been denied and that the entire subject matter should be "relegated to the political arena" has been rejected by the United States Supreme Court. *Williams v Rhodes,* 393 US 23, 28; 89 S Ct 5; 21 L Ed 2d 24 (1968).

An action for mandamus lies to secure the right of a party, candidate or electors to have a candidate's name appear on the ballot.[8] "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v Sanders,* 376 US 1, 17; 84 S Ct 526; 11 L Ed 2d 481 (1964).

The First Amendment secures the "right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively"; the Fourteenth Amendment protects those rights "from infringement by the States." *Williams v Rhodes, supra,* p 30. "Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms." *Id,* p 32.

The Equal Protection Clause forbids the state from imposing "unduly burdensome conditions" on minor parties and independent candidates. *American Party of Texas v White,* 415 US 767, 788; 94 S Ct 1296; 39 L Ed 2d 744 (1974). "[F]easible means for other political parties and other candidates to

faction or convention was 'regular,' under the party rules and customs, of which the court will take judicial notice." 25 Am Jur 2d, Elections, § 126, pp 812–813.

    [8] *See Soutar v St Clair County Election Commission,* 334 Mich 258; 54 NW2d 425 (1952); *Wojcinski v State Board of Canvassers,* 347 Mich 573; 81 NW2d 390 (1957); 26 Am Jur 2d, Elections, § 220, p 49.

appear on the general election ballot" are required. *Storer v Brown,* 415 US 724, 728; 94 S Ct 1274; 39 L Ed 2d 714 (1974). "The right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes." *Williams v Rhodes, supra,* p 31.

In the major parties, intraparty disputes concerning candidacies for some offices *(e.g.,* governor, state senator or representative) are determined at direct primaries; candidates for other offices *(e.g.,* lieutenant governor, attorney general) are selected at party conventions.[9] Under the statute, direct primaries are not available to parties polling less than 5% of the vote; all candidates must be nominated at party caucuses or conventions.[10]

Now that small parties are required to certify their candidates no later than 49 days before the primary,[11] it might be feasible to provide by statute for resolution by direct primary of disputes regarding candidacies arising in small parties. Such a legislative solution would adequately protect the rights of minority candidates of all factions and electors wishing to vote for them.

Absent a legislative solution or an opportunity for resolution of disputes concerning candidates through a party's internal processes, candidates and electors properly look to the judicial branch of government to protect the electoral rights secured by constitution and statute. Unless the judiciary provides a meaningful remedy, a minority faction, without regard to the legitimacy of its claims, could, by merely asserting them, preclude a qualified party, its candidates, and electors desiring to vote for them from access to the ballot.

---

[9] MCLA 168.52, 168.72, 168.162; MSA 6.1052, 6.1072, 6.1162.

[10] MCLA 168.532; MSA 6.1532.

[11] MCLA 168.686a; MSA 6.1686(1).

III

The Court states, "The Legislature has provided
the means by which new parties may obtain a
place and old parties may continue on the ballot.
Only one American Independent Party has quali-
fied for *a* column." (Emphasis by the Court.) That
is indeed the point. The AIP has qualified. Even if
it is thought that *Shields-Stephenson* have been
superseded by subsequent legislation[12] or that the
remedy there provided is no longer appropriate,
that does not justify the failure to provide any

[12] Although the election law has been changed since *Shields* and
*Stephenson,* the revised statute does not require that the rationale of
those cases be discarded.

The Court states that "[a]fter *Shields* and *Stephenson* * * * the
Legislature added the requirement that the vignette and names of
candidates of a new political party be certified to the Secretary of
State by the party's state central committee." Vignettes were, how-
ever, required of "any political party or organization," prior to
*Shields* and *Stephenson.* 1891 PA 190, § 11.

The statute in effect when *Shields* and *Stephenson* were decided
(1891 and 1898) provided [the bracketed words were added by 1895
PA 17]:

"Sec. 10. The said board of election commissioners shall cause to be
printed on the ballot the names of the candidates nominated by the
regularly called conventions of any party, and it shall be the duty of
the State, district or county committee of each political party to
forward to the [chairman of the] said board of election commissioners
of each county in the State, not less than twenty days prior to any
such election a copy of the vignette adopted by them and the names
of all candidates nominated at any regularly called convention, at
which candidates for any of the offices mentioned in section one of
this act shall be nominated, and *no other names unless authorized or
instructed by said convention* [except that in the county of Wayne
such county and district committees shall perform such duties no less
than ten days prior to any such election]. All the names of parties so
nominated shall be certified to by the chairman and secretary of the
respective committees." 1891 PA 190, § 10 (emphasis added).

There is as much basis for reading into this statute (on the strength
of the emphasized words) a requirement that each party be permitted
only one candidate, notwithstanding intraparty disputes, as there is
for a similar inference from the present Election Law's "vote perform-
ance" and signature qualification requirements.

The policy reasons for preferring the *Shields-Stephenson* remedy
are well expressed in those opinions and there is no need to repeat
them.

remedy or means for resolving the dispute so that the rightful candidates of the AIP would appear on the general election ballot. The AIP qualified for *a* column; the rightful nominees of that party and electors desiring to vote for them were entitled to an efficacious remedy in lieu of the *Shields-Stephenson* remedy (now declared to be no longer available) that would secure the right to appear in that column for all offices for which nominations were made.

To be sure, there is a considerable body of law to the effect that courts avoid deciding intraparty disputes and will abide by the resolution of such disputes reached through the internal processes of the party. In the application of this principle, the courts will not resolve internal disputes arising at a party convention where the means exist for the convention itself to resolve the dispute. *O'Brien v Brown*, 409 US 1, 4, 5; 92 S Ct 2718; 34 L Ed 2d 1 (1972); see also *Cousins v Wigoda*, 419 US 477; 95 S Ct 541; 42 L Ed 2d 595 (1975).

The principle of those cases does not control where it is not possible to obtain resolution internally because the dispute arises at the highest state level of the party,[13] resolution at a national level of the party is not available,[14] and the consequence of failing to provide judicial relief is to deny access to the ballot.

Where more than one slate purporting to be the

---

[13] Where the dispute arises at a local, district or county level of the party, it will generally be possible to obtain resolution of the dispute at a higher level through the party's internal processes.

[14] Since the organization of parties is generally controlled by state statute, the extent to which national parties may exercise—apart from such control as they may have at their national conventions—supervisory control over the processes of the state parties is a question of considerable difficulty.

In this case it does not appear that any national organization of the American Independent Party has or would exercise any supervisory power to decide the dispute which gave rise to this controversy.

"regular" slate is presented to the election officials
and the issue cannot be resolved through the
internal processes of the party, an accommodation
is required of the competing values (keeping the
courts out of the "political thicket"[15] and preserv-
ing access to the ballot) which does not entirely
subvert the electoral opportunity of rightful candi-
dates and of electors desiring to vote for them.

The nature of the judicial remedy may depend
on the existence of objective criteria to which the
courts may refer in determining which group
rightfully represents the party.[16]

## A

The statute provides for the manner in which
parties are organized and for the election of a
state central committee and of officers.[17] By-laws
and other internal rules of operating procedure,
adopted by the parties, supplement the statutory
requirements.

Where there are objective criteria,

—whether a convention was held at the regular
time and place,[18]

—whether the leadership at a convention was
regularly chosen,[19]

---

[15] *Colegrove v Green,* 328 US 549, 556; 66 S Ct 1198; 90 L Ed 1432
(1946). *But see Baker v Carr,* 369 US 186, 202; 82 S Ct 691; 7 L Ed 2d
663 (1962), and *Wesberry v Sanders,* 376 US 1, 3; 84 S Ct 526; 11 L
Ed 2d 481 (1964).

[16] There may be a preliminary question whether by reason of the
intraparty struggle the party has ceased to be a viable political entity.
In their brief in the Court of Appeals the defendants argued that the
"split is of a fundamental, ideological and tactical nature which
pervades the entire spectrum of this party's activities." These asser-
tions have not been evidentially established. Moreover, the Director of
Elections placed the AIP on the ballot thereby certifying his belief
that, despite what occurred, it is entitled to a place on the ballot.

[17] MCLA 168.591 *et seq.;* MSA 6.1591 *et seq.*

[18] *State ex rel Riley v Weston,* 31 Mont 218; 78 P 487 (1904).

[19] *Addle v Davenport,* 7 Idaho 282; 62 P 681 (1900); *Spelling v
Brown,* 122 Cal 277; 55 P 126 (1898).

—whether a majority of the party remained at a regularly called meeting or convention,[20]

—whether statutory requirements[21] or party procedural rules have been followed,[22]

a court can, avoiding issues of ideological heirship and subjective notions of which group ought to be recognized, determine the group rightfully in control of the party.

Whatever occasioned the instant dispute, a court of law approaching the factual aspects of the dispute, as it would other factual disputes, might be able to determine by reference to objective criteria, without becoming involved in doctrinal controversy, who is rightfully in control of the party, which convention was the rightful convention, and who are the rightful candidates of the party. If so, those candidates were entitled to have their names appear on the ballot.

This Court and courts in other jurisdictions,[23] have recognized the essential difference between a choice on ideological grounds—which the courts may not undertake—and reliance on objective criteria. In *Beck v Board of Election Commissioners,* 103 Mich 192, 195; 61 NW 346 (1894), and *Burns v Board of Election Commissioners,* 154 Mich 471; 117 NW 1050 (1908), a minority of the delegates withdrew from party conventions. This

---

[20] *Beck v Election Commissioners,* 103 Mich 192, 195; 61 NW 346 (1894); *Burns v Board of Election Commissioners,* 154 Mich 471; 117 NW 1050 (1908); *State ex rel Fosser v Lavik,* 9 ND 461; 83 NW 914 (1900); *State ex rel Granvold v Porter,* 11 ND 309; 91 NW 944 (1902); *Whipple v Broad;* 25 Colo 407; 55 P 172 (1898).

[21] *Walling v Lansdon,* 15 Idaho 282; 97 P 396 (1908); *State ex rel Wolfe v Falley,* 9 ND 450; 83 NW 860 (1900); *State ex rel Garn v Board of Election Commissioners of Marshall County,* 167 Ind 276; 78 NE 1016 (1906).

[22] *State ex rel Howells v Metcalf,* 18 SD 393; 100 NW 923 (1904).

[23] *See* cases cited in fns 18–22, *supra.*

Court held that the nominees of the conventions were entitled to a position on the ballot. The convention, said the Court in *Beck,* was "regularly called, and that after the retirement of [the protesting minority] a majority of the delegates elect remained, constituting a valid convention".[24] The Court's holding and reasoning in *Burns* is set forth in its brief opinion:

"PER CURIAM. The record shows that relator received 6 of 11 votes of the regularly elected delegates in a regularly constituted convention. Respondent Edward McNamara received 5 votes in a seceding body of 5. Under these circumstances, it is clear that relator is entitled to a place on the regular republican ticket, and that respondent is entitled to no place upon the official ballot. *Beck v Election Com'rs,* 103 Mich 192; *Potter v Deuel,* 149 Mich 393 [112 NW 1071 (1907)]."[25]

Although the record in the instant case does not permit a determination of which slate of nominees should be recognized, this Court ought not, by general pronouncement, appear to foreclose the possibility of inquiry on the basis of objective criteria in those cases where such inquiry may be practicable and appropriate.

---

[24] *Beck* was decided after *Shields* but before *Stephenson.* The *Stephenson* Court commented on *Beck,* pp 415–416:

"We are not dealing with a case [such as *Beck]* in which a candidate has been nominated in a regularly called convention, by a majority of the delegates regularly elected, and admittedly entitled to seats in the convention, or shown by the undisputable evidence to be entitled to seats therein, as was the case in *Beck v Wayne Co Election Com'rs,* 103 Mich 192. In such a case the question presented may be a mere question of law, and the candidate regularly nominated entitled to a place on the party ticket, to the exclusion of one who may have been nominated by the refractory minority."

[25] More recently, the Court of Appeals indicated that judicial inquiry into the regularity of a political party convention may be appropriate. *Lavan v Rettinger,* 1 Mich App 661; 137 NW2d 778 (1965).

B

Where an intraparty dispute is not resolvable by reference to objective criteria, this Court, *Shields v Jacob, supra; Stephenson v Boards of Election Commissioners, supra,* and other courts[26] have permitted both slates of nominees to appear on the ballot.[27]

The *Shields-Stephenson* remedy implements the concept that free choice by the electorate and open access to the ballot are at the heart of our constitutionally protected freedoms. Neither the courts nor a governmental official need choose between competing slates; unpopular candidates and ideas may be ignored by the voters rather than being excluded by an arm of government.

The remedy has the advantage of applying equally to both unpopular parties and those with a large and established following.

While the Legislature now requires new and existing parties to demonstrate a measure of popu-

[26] *See, e.g., State, ex rel Gillis v Johnson,* 18 Mont 556; 46 P 440 (1896); *People ex rel Hodges v McGaffey,* 23 Colo 156; 46 P 930 (1896); *State ex rel Dahlman v Piper,* 50 Neb 25; 69 NW 378 (1896).

[27] The statement in *Storer v Brown,* 415 US 724, 735; 94 S Ct 1274; 39 L Ed 2d 714 (1974), that the general election ballot "is not a forum for continuing intraparty feuds" merely described the purpose of the California Legislature in barring a defeated primary candidate from running as an independent in the general election. It does not preclude a state court from ordering printed on the general election ballot the names of competing candidates who have not run in a primary, as a means of providing—without involving the court in doctrinal controversy—a meaningful remedy for unresolved and unresolvable intraparty controversy.

The statement in *American Party of Texas v White,* 415 US 767, 781; 94 S Ct 1296; 39 L Ed 2d 744 (1974), "that the State may limit each political party to one candidate for each office on the ballot and may insist that intraparty competition be settled before the general election by primary election or by party convention," does not reach the question here presented of the judicial role in protecting the electoral process where the state does not provide a primary and there is a dispute regarding who are the rightful nominees of the party which cannot be resolved through internal party processes.

lar support before they qualify for the ballot, the AIP has so qualified. The Legislature has not authorized the Secretary of State to exclude from the ballot a qualified party and its rightful candidates.

A court may, in an appropriate case, authorize competing slates to appear on the ballot, not because the statute contemplates that course but because it may appear to be the least undesirable of the alternatives, providing a means of preserving access to the ballot without compromising the courts or diluting the political process.[28]

## IV

The state party conventions of the major parties nominate candidates for the offices of Lieutenant Governor, Secretary of State, Attorney General, the Supreme Court, and the state educational boards.

Unless the Court is prepared to say to the Democratic and Republican parties that they are without remedy should a competing slate be submitted by persons purporting to represent one of those parties, that the nominees of the regular party conventions will not appear on the ballot unless the majority comes to terms with the usurpers, it cannot properly deny the AIP access to the ballot merely because a dispute has arisen.

By refusing to provide any relief, this Court precludes the rightful—majority—candidates of the AIP, whoever they may be, from appearing on the ballot. The Court's decision permits a minority to circumvent the will of the majority. Denying

---

[28] This remedy provides in effect a combined primary and general election opportunity for the candidates of both factions.

the majority access to the ballot unless it can reach an accommodation with a minority is tantamount to a requirement of unanimity. That is not democracy but an invitation to anarchy.

## V

This Court cannot properly decide a case without an accompanying statement of the reasons for decision. The Constitution requires that every decision of the Court "contain" a statement of the reasons for decision:

"Decisions of the supreme court, including all decisions on prerogative writs, shall be in writing and shall contain a concise statement of the facts and reasons for each decision and reasons for each denial of leave to appeal. When a judge dissents in whole or in part he shall give in writing the reasons for his dissent." Const 1963, art 6, § 6.

To decide before engaging in the process of opinion writing is to ignore the constitutional requirement and the importance of the opinion-writing process. To do so with "opinion to follow" may necessitate a subsequent search for *post facto* reasons and rationalizations to justify the decision already made.

The need to articulate reasons for decision serves purposes more fundamental than merely explaining to the litigants and other interested persons the law as it applies to the case. For many, the optimal decision-making occurs as they write, or after they have written. Personal dissatisfaction with a draft opinion may stem as much from doubts about the soundness of the analysis as the manner of expression.

In a comparable context, it was observed:

"It is sometimes said that the requirement that the trial judge file findings of fact is for the convenience of the upper courts. While it does serve that end, it has a far more important purpose—that of evoking care on the part of the trial judge in ascertaining the facts. For, as every judge knows, to set down in precise words the facts as he finds them is the best way to avoid careless-ness in the discharge of that duty: *Often a strong impression that, on the basis of the evidence, the facts are thus-and-so gives way when it comes to expressing that impression on paper." United States v Forness,* 125 F2d 928, 942 (CA 2, 1942) (emphasis supplied).

The opinion which "won't write" may be an opinion which should not be written. The process of putting thoughts on paper, of grappling with the precedents, and of assembling an orderly anal-ysis constitutes a crucial check on judicial over-sight, error and arbitrariness. So too does the process of circulating an opinion among colleagues with the possibility of further analysis and re-ex-amination upon receipt of written expression of an opposing view.

Dean Leflar has said:

"One function that is recognized both by detached students of the judicial process and by opinion writers themselves is that the necessity for preparing a formal opinion assures some measure of thoughtful review of the facts in a case and of the law's bearing upon them. Snap judgments and lazy preferences for arm-chair theorizing as against library research and time-consum-ing cerebral effort are somewhat minimized. The check-ing of holdings in cases cited, the setting down of reasons in a context of comparison with competing reasons, the answering of arguments seriously urged, the announcement of a conclusion that purportedly follows from the analysis set out in the opinion, are antidotes to casualness and carelessness in decision. They compel thought. It is even necessary that the thought have some of the quality of rigorousness in it.

This does not assure that any particular opinion will be a good one, but it does increase the likelihood that it will be fairly good. That is a genuine function of judicial opinions, everyone will agree." Leflar, *Some Observations Concerning Judicial Opinions,* 61 Colum L Rev 810 (1961) (footnote omitted).

The need for adequate time for reflection[29] and caution in deciding election cases is demonstrated by the history of the litigation culminating in this Court's decision in *Young v Detroit City Clerk,* 389 Mich 333; 207 NW2d 126 (1973), where on plenary consideration we held that the constitutional provision precluding a member of the Legislature from receiving any civil appointment within the state during the term for which he is elected did not preclude then Senator Young from being a candidate for Mayor of Detroit. We held that this Court's summary decisions to the contrary in three earlier cases[30] (including one involving Coleman Young himself) were overruled as "incorrectly decided."

Leave to appeal should have been denied. The deficiencies perceived by the Court in the disposition of the Court of Appeals did not warrant summary intervention without adequate time for consideration and reflection. Alternatively, the cause should have been remanded for an evidentiary hearing regarding the nature of the dispute and determination whether, in the application of objective criteria, the Court can decide which group was rightfully in control of the party, and

---

[29] *See, generally, New York Times Co v United States,* 403 US 713, 752; 91 S Ct 2140; 29 L Ed 2d 822 (1971) (Harlan, J., dissenting); and *Rosenberg v United States,* 346 US 273, 301; 73 S Ct 1152; 97 L Ed 1607 (1953) (Frankfurter, J., dissenting).

[30] *McCoy v Board of Election Commissioners of Highland Park,* Docket No 52,217 (Mich, Oct 22, 1968); *Young v Leadbetter,* Docket No 52,523 (Mich, July 2, 1969); *O'Brien v Detroit Election Commission,* 383 Mich 707; 179 NW2d 19 (1970).

for entry of an appropriate decree securing the
right of the AIP to have candidates for all offices
for which nominations were made appear on the
ballot.