*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LEAGUE OF WOMEN VOTERS OF MICHIGAN,
DEBORAH BUNKLEY, ELIZABETH CUSHMAN,
and SUSAN SMITH,

FOR PUBLICATION
July 14, 2020
9:00 a.m.

Plaintiffs,

v

No. 353654

SECRETARY OF STATE,

Defendant.

Before: SAWYER, P.J., and GLEICHER and RIORDAN, JJ.

SAWYER, P.J.

Plaintiffs filed this complaint for mandamus seeking an order of this Court directing defendant to implement certain procedures regarding the processing of absentee ballots. After reviewing the parties' briefs and hearing oral argument, we are not persuaded that plaintiffs are entitled to relief and we deny the writ for mandamus.

Plaintiff League of Women Voters of Michigan is a statewide organization with an interest in voting rights. The individual plaintiffs are League members and registered voters residing in Michigan. Defendant Secretary of State ("defendant") is "the chief election officer of the state" with "supervisory control over local election officials in the performance of their duties under the provisions of" the Michigan Election Law, MCL 168.1 *et seq.* MCL 168.21. Defendant shall "[a]dvise and direct local election officials as to the proper methods of conducting elections." MCL 168.31(1)(b).

In November 2018, Michigan voters approved Proposal 3, which granted all Michigan voters the constitutional right to vote by absentee ballot without stating a reason.[1] That right was

---

[1] Prior to the passage of Proposal 3 in 2018, state election law required voters to indicate one of six reasons for voting by absentee ballot. MCL 168.759.

incorporated into Const 1963, art 2, § 4, pertaining to the place and manner of elections. Const 1963, art 2, § 4, as amended, states in relevant part as follows:

> (1) Every citizen of the United States who is an elector qualified to vote in Michigan shall have the following rights:
>
> (a) The right, once registered, to vote a secret ballot in all elections.
>
> * * *
>
> (g) The right, once registered, to vote an absent voter ballot without giving a reason, during the forty (40) days before an election, and the right to choose whether the absent voter ballot is applied for, received and submitted in person or by mail. During that time, election officials authorized to issue absent voter ballots shall be available in at least one (1) location to issue and receive absent voter ballots during the election officials' regularly scheduled business hours and for at least eight (8) hours during the Saturday and/or Sunday immediately prior to the election. Those election officials shall have the authority to make absent voter ballots available for voting in person at additional times and places beyond what is required herein.
>
> * * *
>
> All rights set forth in this subsection shall be self-executing. This subsection shall be liberally construed in favor of voters' rights in order to effectuate its purposes. Nothing contained in this subsection shall prevent the legislature from expanding voters' rights beyond what is provided herein. This subsection and any portion hereof shall be severable. If any portion of this subsection is held invalid or unenforceable as to any person or circumstance, that invalidity or unenforceability shall not affect the validity, enforceability, or application of any other portion of this subsection.
>
> (2) Except as otherwise provided in this constitution or in the constitution or laws of the United States the legislature shall enact laws to regulate the time, place and manner of all nominations and elections, to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting. . . .

In light of the voters' approval of Proposal 3 and the amendments to Const 1963, art 2, § 4, the Michigan Legislature enacted 2018 PA 603, which amended certain provisions of the Michigan Election Law.[2] Plaintiffs contend that some provisions pertaining to absentee voting have not been amended to conform with the amendments to Const 1963, art 2, § 4. Plaintiffs filed a three-count

---

[2] We note that it appears that the Legislature is continuing to consider these issues. See, e.g., HB 5807, which, if passed as introduced, would address some of the issues presented in this case.

complaint for mandamus challenging the statutory requirement that absentee ballots be received by 8:00 p.m. on election day and the statutory requirement that voters pay the postage to return an absentee ballot. Plaintiffs also allege that the received-by deadline violates the purity of elections clause set forth in Const 1963, art 2, § 4, the free speech and assembly clauses set forth in Const 1963, art 1, §§ 3 and 5, the right to equal protection set forth in Const 1963, art 1, § 2, and the right to vote set forth in Const 1963, art 2, § 4(1)(a). Further, plaintiffs allege that some city and township clerks fail to adhere to the requirement set forth in MCL 168.761(1) that the clerk "immediately" upon receipt of an absent voter application mail an absentee ballot to the voter and fail to adhere to the requirement set forth in Const 1963, art 2, § 4(1)(g) guaranteeing voters the right to vote by absentee ballot in the 40 days before an election.

"[M]andamus is the proper remedy for a party seeking to compel election officials to carry out their duties." *Citizens Protecting Michigan's Constitution v Secretary of State*, 324 Mich App 561, 583; 922 NW2d 404 (2018), aff'd 503 Mich 42 (2018). "To obtain the extraordinary remedy of a writ of mandamus, the plaintiff must show that: (1) the plaintiff has a clear, legal right to performance of the specific duty sought, (2) the defendant has a clear legal duty to perform, (3) the act is ministerial, and (4) no other adequate legal or equitable remedy exists that might achieve the same result." *Rental Props Owners Ass'n of Kent Co v Kent Co Treasurer*, 308 Mich App 498, 518; 866 NW2d 817 (2014), lv den 498 Mich 853 (2015). "A clear legal right is a right clearly founded in, or granted by, law; a right which is inferable as a matter of law from uncontroverted facts regardless of the difficulty of the legal question to be decided." *Attorney General v Bd of State Canvassers*, 318 Mich App 242, 249; 896 NW2d 485 (2016). "A ministerial act is one in which the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Berry v Garrett*, 316 Mich App 37, 42; 890 NW2d 882 (2016) (quotation marks and citation omitted). A writ of mandamus is inappropriate if the act sought to be performed involves judgment or the exercise of discretion. *Hanlin v Saugatuck Twp*, 299 Mich App 233, 248; 829 NW2d 335 (2013). The plaintiff has the burden of demonstrating entitlement "to the extraordinary remedy of a writ of mandamus." *Citizens Protecting Michigan's Constitution*, 324 Mich App at 584.

The most significant issue presented in this case is Count I of plaintiffs' complaint, whether the statutory requirement that absentee ballots be received by the local election clerk by 8 p.m. on election day violates Const 1963, art 2, § 4. We conclude that it does not. But, before analyzing this question, we must address plaintiffs' position that defendant has conceded that the "received by" rule is unconstitutional. We read defendant's brief as agreeing with plaintiffs that the "received by election day" requirement does violate Const 1963, art 2, § 4, but with some reservations. After advancing a construction of Proposal 3 that largely agrees with plaintiffs' position on this point, defendant then states:

> The larger issue, and arguably the highest hurdle to this construction of § 4(1)(g), is the absence of language regarding when an AV ballot voted by mail by election day must be received by an election official in order to be counted. This silence could be viewed as evidence that the construction advanced above is faulty. The better interpretation, however, is that the drafters left space within the Constitution in which the Legislature can act through supplemental legislation. But the Legislature has not yet done so, and the only recourse at this time is to consult existing statutory provisions for guidance. [Defendant's brief, p 15.]

Moreover, at oral argument, defendant's attorney certainly seemed to take a position that agreed with plaintiffs that the "received by election day" requirement violates the Constitution as amended by Proposal 3. But we do not view such a concession by defendant as resolving the issue.

We recognize the ability, indeed the desirability, of parties in a lawsuit to resolve their differences amongst themselves without the unnecessary intervention of the courts. But it is one thing for parties in a particular action to reach an agreement that only affects those parties in that action. It is yet another thing to allow parties to reach an agreement that would affect the entire state by means of an agreement as to the proper interpretation of a statute or the Constitution as will be applied generally. This, ultimately, is the province of the courts. Indeed, as Chief Justice Marshall wrote long ago in *Marbury v Madison*, 5 US 137, 177 (1803), "It is emphatically the province and duty of the judicial department to say what the law is. . . . If two laws conflict with each other, the courts must decide on the operation of each."

Chief Justice Marshall expounded on this in further detail:

The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? The distinction, between a government with limited and unlimited powers, is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed, are of equal obligation. It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or, that the legislature may alter the constitution by an ordinary act.

Between these alternatives there is no middle ground. The constitution is either a superior, paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and like other acts, is alterable when the legislature shall please to alter it.

If the former part of the alternative be true, then a legislative act contrary to the constitution is not law: if the latter part be true, then written constitutions are absurd attempts, on the part of the people, to limit a power, in its own nature illimitable.

Certainly all those who have framed written constitutions contemplate them as forming the fundamental and paramount law of the nation, and consequently the theory of every such government must be, that an act of the legislature, repugnant to the constitution, is void.

This theory is essentially attached to a written constitution, and is consequently to be considered, by this court, as one of the fundamental principles of our society. It is not therefore to be lost sight of in the further consideration of this subject.

If an act of the legislature, repugnant to the constitution, is void, does it, notwithstanding its invalidity, bind the courts, and oblige them to give it effect? Or, in other words, though it be not law, does it constitute a rule as operative as if it was a law? This would be to overthrow in fact what was established in theory; and would seem, at first view, an absurdity too gross to be insisted on. [5 US at 176-177.]

While Chief Justice Marshall was addressing a case of Congress exceeding the limits of its powers in enacting legislation, we find guidance here where we are faced with the powers of an executive branch official exercising executive power. That is, we posit that, just as a legislative body cannot legitimately enact a statute that is repugnant to the Constitution, nor can an executive branch official effectively declare a properly enacted law to be void by simply conceding the point in litigation. To vest such power in an official, it would effectively grant such official the power to amend the Constitution itself. And, just as Chief Justice Marshall rejected the ability of a legislative body amending the Constitution by an ordinary act, we must reject the ability of an executive branch official to do the same.[3] When a dispute arises regarding whether a properly enacted statute violates the Constitution, that dispute must be resolved by the courts, not by a single individual within the executive branch.[4]

For these reasons, to the extent that defendant concedes that the existing statutory scheme violates the Michigan Constitution in light of Proposal 3, we reject the idea that this resolves this dispute or is binding on this Court. While we give the Secretary's position due consideration, we are not bound by it. Rather, we must now continue to our own analysis regarding whether the existing "received by election day" rule is now contrary to Const 1963, art 2, § 4. We conclude that it is not.

Plaintiffs allege that the statutory requirement that absentee ballots be received by 8:00 p.m. on election day violates Const 1963, art 2, § 4(1)(g), which guarantees voters the right to vote by absentee ballot "during the forty (40) days before an election" and the right "to choose whether the absent voter ballot is applied for, received and submitted in person or by mail." Plaintiffs assert that the provision requires that any absentee ballot submitted by mail in the 40 days before an

---

[3] This is not to say that neither the Legislature nor the executive branch have a role to play in interpreting the Constitution. It is certainly contemplated that the Legislature would consider the Constitution whenever it enacts a statute and reject those that it finds to be repugnant to the Constitution. That is, we would expect the Legislature to exercise constitutional self-restraint. Similarly, we would think it a duty of a Governor to reject (i.e., veto) a bill passed by the Legislature if the Governor is convinced that the bill violates the Constitution.

[4] There is, of course, a role for the Legislature and the Governor to play in resolving such a dispute if they choose to do so by repealing or amending the statute at issue. But if such action is taken, while it would resolve the dispute, it would not resolve the question of the constitutionality of the prior enactment. And, more importantly to the present dispute, it is not dependent on the actions of a single member of the executive branch.

election must be counted even if it is received after 8:00 p.m. on election day. Plaintiffs rely on the self-executing provision of Const 1963, art 2, § 4, which states, in relevant part:

> All rights set forth in this subsection shall be self-executing. This subsection shall be liberally construed in favor of voters' rights in order to effectuate its purposes.

Plaintiffs contend that self-executing constitutional provisions are judicially enforceable without further legislation. Defendant argues that plaintiffs have not demonstrated a clear legal right to the performance of the act sought, but also argues that declining to count ballots received after the 8:00 p.m. on election day deadline appears to violate Const 1963, art 2, § 4.

The 8:00 p.m. received-by deadline set forth in MCL 168.764a[5] states, in relevant part, as follows:

> The following instructions for an absent voter shall be included with each ballot or set of ballots furnished an absent voter:
>
> * * *
>
> Step 6. The ballot must reach the clerk or an authorized assistant of the clerk before the close of the polls on election day. An absent voter ballot received by the clerk or assistant of the clerk after the close of the polls on election day will not be counted.

MCL 168.720 provides that polls close at 8:00 p.m. The question presented is whether the amended language in Const 1963, art 2, § 4(1)(g) renders the 8:00 p.m. received-by deadline unconstitutional. In interpreting constitutional provisions, this Court applies two rules of interpretation. *Makowski v Governor*, 495 Mich 465, 472, 473; 852 NW2d 61 (2014). "First, the interpretation should be the sense most obvious to the common understanding; the one which reasonable minds, the great mass of people themselves, would give it." *Id*. (quotation marks and

---

[5] Although plaintiffs argue that the 8:00 p.m. received-by deadline contravenes Const 1963, art 2, § 4, they do not identify the specific statutory language that they assert is unconstitutional. It appears that plaintiffs challenge the language set forth in MCL 168.764a, the provision providing general instructions for absentee voters. MCL 168.759b also requires that absentee ballots "be returned to the clerk in time to be delivered to the polls prior to 8 p.m. on election day," but that provision pertains to emergency absentee voter applications submitted after the absentee voter application deadline because of physical disability or a voter's absence from the city or township because of sickness or death in his or her family. It does not appear that plaintiffs challenge that provision because they made no mention of it in their brief. For all practical purposes, however, plaintiffs' arguments would apply to either provision.

citation omitted).[6]  "Words should be given their common and most obvious meaning, and consideration of dictionary definitions used at the time of passage for undefined terms can be appropriate." *In re Burnett Estate*, 300 Mich App 489, 497-498; 834 NW2d 93 (2013).  Every constitutional provision "must be interpreted in the light of the document as a whole, and no provision should be construed to nullify or impair another." *Lapeer Co Clerk v Lapeer Circuit Court*, 469 Mich 146, 156; 665 NW2d 452 (2003).  Second, the interpretation should consider "the circumstances surrounding the adoption of the constitutional provision and the purpose sought to be accomplished." *Id.* (quotation marks and citation omitted).

Plaintiffs and defendant interpret the first sentence of Const 1963, art 2, § 4(1)(g), as requiring that ballots mailed by election day be counted.  The provision guarantees voters "[t]he right, once registered, to vote an absent voter ballot without giving a reason, during the forty (40) days before an election, and the right to choose whether the absent voter ballot is applied for, received and submitted in person or by mail."  Thus, it grants voters the right to vote by absentee ballot without giving a reason in the 40 days before an election *and* the right to choose whether to submit the ballot in person or by mail.  But we do not share plaintiff's view that these two clauses, when read together, render the "received by" rule unconstitutional.

We turn first to addressing Justice Cooley's directive that we consider what the "great mass of the people" would understand Proposal 3 to mean when they adopted it.  There are two primary sources to guide us.  First, the summary "statement of purpose" that actually appeared on the ballot and, second, the actual language of the constitutional amendment.  We turn first to the ballot summary.

Const 1963, art 12, § 2, states that a ballot used to amend the constitution by petition of registered voters "shall contain a statement of the purpose of the proposed amendment . . . ."  The ballot at issue provided the following statement regarding Proposal 3's purpose:

**Proposal 18-3**

**A proposal to authorize automatic and Election Day voter registration, no-reason absentee voting, and straight ticket voting; and add current legal requirements for military and overseas voting and postelection audits to the Michigan Constitution**

This proposed constitutional amendment would allow a United States citizen who is qualified to vote in Michigan to:

- Become automatically registered to vote when applying for, updating or renewing a driver's license or state-issued personal identification card, unless the person declines.

---

[6] The principle of looking to the meaning that "reasonable minds, the great mass of the people themselves, would give it" is deeply rooted in Michigan jurisprudence, going back to a treatise by Justice Cooley.  See Cooley's Const Lim (6th ed), p 81.

- Simultaneously register to vote with proof of residency and obtain a ballot during the 2-week period prior to an election, up to and including Election Day.

- Obtain an absent voter ballot without providing a reason.

- Cast a straight-ticket vote for all candidates of a particular political party when voting in a partisan general election.

Should this proposal be adopted?

[ ] YES

[ ] NO[7]

Only the third bullet point addresses absentee voting. And that bullet point only addresses the right to vote by absentee ballot without providing a reason.[8] Not only does it not address a deadline by which the absentee ballot must be received by the election clerk, it does not even address creating a right to submit that ballot by mail. Accordingly, a voter whose knowledge of the proposal was limited to reading the "statement of purpose" that appeared on the ballot would not have understood it to have a created a constitutional right to vote that ballot by mail, much less when it must be received by.

Of course, a more conscientious voter who took the time to read the entire proposed language of the proposed constitutional amendment would understand that it incorporated provisions regarding absentee voting beyond not having to provide a reason for doing so. But this, too, falls short of creating an expectation or understanding by the voters that they could mail the ballot on election day and have it counted even though it would be received after election day. The language of the amendment itself is devoid of any provision regarding when the ballot must be mailed by or when it must be received. Those issues are simply unaddressed. But the amendment is not completely devoid of references to when the local election officials must accept those ballots:

(g) The right, once registered, to vote an absent voter ballot without giving a reason, during the forty (40) days before an election, and the right to choose whether the absent voter ballot is applied for, received and submitted in person or by mail. *During that time, election officials authorized to issue absent voter ballots shall be available in at least one (1) location to issue and receive absent voter ballots during the election officials' regularly scheduled business hours and for at least eight (8) hours during the Saturday and/or Sunday immediately prior to the election.* Those

---

[7] Official Ballot Wording Approved by Board of State Canvassers, September 7, 2018 <https://www.michigan.gov/documents/sos/Official_Ballot_Wording_Prop_18-3_632053_7.pdf> accessed June 18, 2020).

[8] Similarly, that is the only portion of the absentee voting rules that appear in the bold-faced header in the ballot language.

election officials shall have the authority to make absent voter ballots available for voting in person at additional times and places beyond what is required herein. [Emphasis added.]

While the emphasized language does not create any specific deadline by which ballots must be received, it is suggestive that election officials are only obligated to be available during regular business hours, plus some additional hours on the weekend immediately preceding the election. While this would not necessarily preclude a belief that ballots mailed on or before election day but received after the polls closed would not be counted, it would suggest to voters that there would be some limitations on when election officials would be obligated to accept, and therefore count, ballots. And it certainly does not create an expectation that a ballot can be mailed on election day and have it counted.

In short, while the language of the amendment itself would not necessarily disabuse a voter of the belief that an absentee ballot mailed on election day but received thereafter would nevertheless be counted, nor does the language create a belief that it would. Thus, we cannot conclude that "the great mass of people" understood that the amendment it was voting on demands the deadline for casting an absentee ballot be based upon the time it is mailed rather than the time that it is received.

We similarly reject the argument that the statutory requirement that an absentee ballot be received by the election officials before the close of the polls on election day impairs the right of a voter to choose to submit their absentee ballot by mail. They certainly possess that right. And, while Proposal 3 creates a 40-day period during which a voter has the ability to receive and cast an absentee ballot, that does not mean that a requirement that a ballot must be received by the time the polls close impairs a voter's ability to mail in their absentee ballot.[9] We acknowledge that it does affect when an absentee voter must mail their ballot so that it arrives by the deadline. But the fact that a voter must act sooner when they choose to mail in their ballot rather than deliver it does not deprive them of the choice; rather, it merely affects how and when that choice must be exercised.

Moreover, any deadline has an arbitrary nature to it and different policy considerations behind it. Even plaintiffs' suggestion that we rule that ballots postmarked on or before election day must be counted if received by election officials within the six-day period following election day, while having a valid policy consideration behind it,[10] is also ultimately arbitrary. Additionally, any deadline by which a ballot must be received creates the possibility that some

---

[9] One of the issues presented in this case, which will be addressed infra, deals with an allegation that not all local elections clerks make absentee ballots available at the beginning of the 40-day period. This, however, presents a different question.

[10] The six-day deadline coincides with the date by which local clerks must determine whether to count any provisional ballots. MCL 168.813. A provisional ballot is one cast on election day by a voter who does not appear on the registration rolls for the polling place at which the voter appears and it must thereafter be determined if the voter was, in fact, eligible to vote. MCL 168.523a.

votes will not be counted. Articles in the media occasionally appear about letters that are delivered years, even decades, after they are mailed.[11] While these are extreme, and undoubtedly rare, examples, they point out that when choosing to submit an absentee ballot by mail, one assumes the risk that the ballot will not arrive by the deadline (any deadline), or even arrive at all.

Certainly, the later the deadline to be received by, the greater the likelihood is that a ballot will arrive in time to be counted. But ultimately any deadline carries with it the possibility that voters will be disenfranchised as their ballots will arrive too late to be counted.[12] Obviously, though, there must be a deadline—at some point, the ballots must be counted and a winner declared. What that deadline should be is a policy decision. And we follow the view that courts should typically defer to the Legislature in making policy decisions. There are many competing considerations—what deadline gives a fair opportunity for all persons to vote on an equal basis, what deadline allows for votes to be counted in a timely manner (and what is considered timely), what other deadlines in the process may need to be changed as well, to name just a few. These are considerations best resolved by reflective legislative consideration, not by judicial fiat.[13] The courts' role is limited to ensuring that the deadline chosen by the Legislature does not effectively preclude the ability of a voter to submit their absentee ballot at any point during the 40 days before an election.[14]

Plaintiffs argue that the provision in Proposal 3 that grants the right to vote by absentee ballot without providing a reason and to submit that ballot by mail, and to do so anytime during the 40 days before an election, requires that a voter be able to mark that ballot and deposit it in the mail anytime during that 40-day period, including on election day. Again, the relevant passage reads: "The right, once registered, to vote an absent voter ballot without giving a reason, during the forty (40) days before an election, and the right to choose whether the absent voter ballot is applied for, received and submitted in person or by mail." § 4(1)(g). While this provision does not define the word "vote," plaintiffs looks to a number of sections within the election statute that

---

[11] See, e.g., "Long-lost letter: Postal Service delivers 81-year-old Christmas card to Billings woman", Billings Gazette, May 27, 2019. <https://billingsgazette.com/news/local/long-lost-letter-postal-service-delivers-81-year-old-christmas-card-to-billings-woman/article_4fac4ebd-88d1-5768-85f6-c7f9c5fe452a.html> accessed June 18, 2020. And, actually, in this case the letter never was actually delivered to the intended recipient or their heir as the article indicates that it was returned to sender (or, actually, the sender's heir, as the sender had died 50 years previously).

[12] For that matter, even in-person voting carries a deadline—to present oneself by the time the polls close. There are likely cases where a voter arrives after the polls close, for whatever reason, and is unable to cast their ballot.

[13] Plaintiffs assert that it is "manageable" to implement a "sent-by-election-day deadline" rather than a "received-by-election-day deadline," even pointing to eleven states that do so. This would certainly be relevant to the Legislature if it chooses to address this issue. But it does not compel this Court to grant plaintiffs' requested relief.

[14] For example, if the Legislature were to set the deadline 45 days before the election, such a provision would clearly violate § 4(1)(g).

use the word "vote" in a context that suggests a meaning of marking a ballot.[15]  Plaintiffs argue that to interpret the word "vote" in § 4(1)(g) as requiring the delivery of the ballot to election officials would render these statutes "nonsensical" and "metaphysically impossible" because the context of the use of the word "vote" in those statutes requires it to mean "marking a ballot" or similar usage.  We are not persuaded by plaintiffs' argument.

We reject the idea that the word "vote" must necessarily be given the exact same meaning under both § 4(1)(g) and the various statutory provisions cited by plaintiffs.  "Vote" has many different meanings, both as a noun and a verb.[16]  But, more to the point, even accepting plaintiffs' argument that "vote" means something akin to "marking the absentee ballot," it does not change the outcome.  Voting is not the single act of marking a ballot, but the entire process.[17]  Indeed, ultimately plaintiffs' argument is self-defeating.  If we accept plaintiffs' argument that the plain text employs "the commonsense meaning that a person 'votes' an absentee ballot when she fills it out,"[18] then we would necessarily have to conclude that all that is guaranteed under Proposal 3 is the right to fill out an absentee ballot, not to have it counted.  Such a conclusion would be absurd.  Accordingly, "vote" must refer to the entire process of voting, which in the context of absentee voting starts with requesting an application to apply for an absentee ballot and continues to the delivery of the completed ballot to the appropriate election officials.

This then brings us back to our previous discussion.  There must be a deadline for the submission of the completed ballot to election officials.  And the deadline under existing law does not effectively preclude a voter from completing the process of voting by absentee ballot during the 40 days before the election.[19]

We turn next to plaintiffs' argument that the statutory requirement that absentee ballots be received by the close of the polls, even if previously constitutional, became unconstitutional because "the legislature may not act to impose additional obligations on a self-executing

---

[15] See MCL 168.764a, MCL 168.759a(6), MCL 168.759a(13), MCL 168.932(i), and MCL 168.931(m).

[16] See, e.g., Merriam-Webster's Collegiate Dictionary (11th ed.), which provides over a dozen different definitions, none of which specifically refer to "marking a ballot" or similar language. The closest are "the act or process of voting" and "a method of voting."

[17] See the definition referred to in the previous footnote.

[18] Plaintiffs' brief, p 20.

[19] As a side note, there is an inherent flaw in plaintiffs' argument that ballots must be counted if mailed on election day, even if received thereafter.  The plain text of § 4(1)(g) guarantees the right "to vote an absent voter ballot . . . during the forty (40) days *before* an election . . ." (emphasis added).  Even if we were to accept plaintiffs' constrained definition of "vote" and the argument that that definition compels the counting of ballots received after the polls close, that would require that the mailed-in ballots would have to have been postmarked the day *before* election day, but not those postmarked *on* election day.  That is, § 4(1)(g) by its terms does not guarantee a right to vote by absentee ballot *on* election day, only during the 40 days *before* election day.

-11-

constitutional provision." *Wolverine Golf Club v Secretary of State*, 384 Mich 461, 466; 185 NW2d 392 (1971). In that case, the Michigan Supreme Court found violative of the state constitution a statutory provision that initiative petitions must be submitted at least ten days before the start of a legislative session. The Court, 384 Mich at 466, reasoned that:

> As pointed out by Judge Lesinski in the opinion below (1970), 24 Mich App 711, 725:
>
> "It is settled law that the legislature may not act to impose additional obligations on a self-executing constitutional provision. *Soutar v. St. Clair County Election Commission* (1952), 334 Mich 258; *Hamilton v. Secretary of State* (1924), 227 Mich 111, 125:
>
> " ' "The only limitation, unless otherwise expressly indicated, on legislation supplementary to self-executing constitutional provisions is that the right guaranteed shall not be curtailed or any undue burdens placed thereon." ' "
>
> Whether we view the ten-day filing requirement in an historical context or as a question of constitutional conflict, the conclusion is the same—the requirement restricts the utilization of the initiative petition and lacks any current reason for so doing.

While Proposal 3, by its express terms, is self-executing, we reject plaintiffs' argument that that precludes the Legislature from applying a deadline by which absentee ballots must be received. As already discussed at length, a deadline is necessary. Indeed, even plaintiffs tacitly admit the necessity of a deadline by proposing a deadline of their own. And while the drafters of Proposal 3 could easily have included a deadline by which ballots must be received, they did not do so. Certainly, the drafters would have been aware of the existing requirement that ballots be received by the close of polls on election day, yet chose not to include a provision altering this deadline in their proposal. Presumably, the drafters were content to leave this decision to the Legislature. Indeed, § 4(2) provides that "the legislature shall enact laws to regulate the time, place and manner of all nominations and elections . . . and to provide for a system of voter registration and absentee voting."

Thus, the question under *Wolverine Golf Club* becomes whether the current deadline curtails or places an undue burden on voters from voting absentee, or submitting their absentee ballot by mail. We conclude that it does not. While a voter may submit their absentee ballot by mail, they are not required to do so. They may personally deliver the ballot in person to the city or township clerk, they may have an immediate family member deliver the ballot, or request the local clerk to pick up the ballot. MCL 168.764a. And, of course, a voter may still mail in their ballot, though with the need to do so sufficiently in advance of election day to ensure the likelihood that it will be delivered by election day. And a voter is provided with a 40-day period in which to do so.

Plaintiffs next argue that the received-by deadline violates the purity of elections clause set forth in Const 1963, art 2, § 4(2). We disagree. The purity of elections clause states that "the legislature shall enact laws to regulate the time, place and manner of all nominations and elections,

-12-

to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting." Const 1963, art 2, § 4(2). "The phrase 'purity of elections' does not have a single precise meaning. However, it unmistakably requires fairness and evenhandedness in the election laws of this state." *Barrow v Detroit Election Comm*, 305 Mich App 649, 676; 854 NW2d 489 (2014) (quotation marks and citation omitted).

> The Michigan Supreme Court has interpreted the "purity of elections" clause to embody two concepts: first, that the constitutional authority to enact laws to preserve the purity of elections resides in the Legislature; and second, that any law enacted by the Legislature which adversely affects the purity of elections is constitutionally infirm. [*Taylor v Currie*, 277 Mich App 85, 96; 743 NW2d 571 (2007), lv den 483 Mich 907 (2009) (quotation marks and citations omitted).]

Plaintiffs argue that the received-by deadline violates the purity of elections clause because it permits two similarly situated individuals to mail their absentee ballots on the same day, but because of differences in mail-processing speeds, one voter's ballot may be timely received and counted and the other voter's ballot may not be timely received and, accordingly, not counted. Plaintiffs also assert that enforcing the received-by deadline results in an impermissible differentiation between absentee voters whose ballots are not counted because they were not received by 8:00 p.m. on election day and voters whose ballots are counted because the voters were standing in line to vote at the polls at 8:00 p.m. when the polls closed. MCL 168.720 provides that "[e]very qualified elector present and in line at the polls at the hour prescribed for the closing therefore shall be allowed to vote." Further, plaintiffs argue that the received-by deadline subverts "the will of the voters who adopted Proposal 3," and that the purity of elections clause requires that ballots mailed by election day be counted. (Plaintiffs' brief, pp 29-30.)

Defendant correctly argues that the received-by deadline is facially nondiscriminatory and applies equally to all voters who choose to submit absentee ballots by mail. Although mail may be processed more expeditiously in some areas and less expeditiously in others, the Legislature has opted to impose a received-by deadline rather than a mailed-by deadline for absentee ballots. That determination was a policy decision and the purity of elections provision grants the Legislature the authority to provide for a system of absentee voting. Plaintiffs essentially ask this Court to implement a policy different from that chosen by the Legislature. Because the purity of elections clause requires the Legislature to make policy determinations, this Court does not have the authority to do so. Moreover, mandamus relief is inappropriate if the act sought to be performed involves judgment or the exercise of discretion. *Hanlin*, 299 Mich App at 248.

Plaintiffs next contend that the received-by deadline violates the free speech and assembly clauses[20] set forth in Const 1963, art 1, §§ 3 and 5, the right to equal protection set forth in Const 1963, art 1, § 2, and the right to vote set forth in Const 1963, art 2, § 4(1)(a). Const 1963, art 1, § 3, guarantees the people of Michigan "the right peaceably to assemble, to consult for the common

---

[20] Plaintiffs fail to articulate how the received-by deadline implicates the constitutional right to peaceably assemble.

good, to instruct their representatives and to petition the government for redress of grievances." Const 1963, art 1, § 5, provides that "[e]very person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press." Const 1963, art 1, § 2, states that "[n]o person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin." Finally, Const 1963, art 2, § 4(1)(a), guarantees Michigan citizens "[t]he right, once registered, to vote a secret ballot in all elections."

Plaintiffs contend that the received-by deadline is facially unconstitutional because not counting an absentee voter's ballot denies the voter his or her right to vote and to free speech. They argue that the deadline particularly burdens the speech of late-deciding voters. They also argue that ballots mailed on the same day could be delivered to the city or township clerk on different days, resulting in some ballots being counted and others not being counted solely because of differing mail delivery times in violation of voters' equal protection rights.

Plaintiffs assert that laws that severely burden protected political expression or differentiate between individuals with respect to fundamental rights are subject to strict scrutiny. In *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich 1, 35; 740 NW2d 444 (2007), however, our Supreme Court held that "the Michigan Constitution does not compel that every election regulation be reviewed under strict scrutiny." The Court recognized that in *Burdick v Takushi*, 504 US 428; 112 S Ct 2059; 119 L Ed 2d 245 (1992), the United States Supreme Court "rejected the notion that every election law must be evaluated under strict scrutiny analysis." *Id*. at 20-21. The Court stated that the *Burdick* Court "recognized that 'to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently.'" *Id*. at 21, quoting *Burdick*, 504 US at 433. Accordingly, the Court "adopt[ed] the 'flexible test' articulated in *Burdick* when resolving an equal protection challenge to an election law under the Michigan Constitution." *Id*. at 35. This Court has also applied the "flexible test" in the context of a first amendment challenge to an election law. See *McDonald v Grand Traverse Co Election Comm*, 255 Mich App 674, 681-683; 662 NW2d 804 (2003), lv den 469 Mich 946 (2003).

A statute is presumed constitutional, and the burden of proving otherwise rests with the party challenging the statute's constitutionality. *In re Request for Advisory Opinion*, 479 Mich at 11. "A party challenging the facial constitutionality of a statute faces an extremely rigorous standard, and must show that no set of circumstances exists under which the act would be valid." *Id*. (quotation marks, citations, brackets, and footnotes omitted). "[S]tates have a compelling interest in preserving the integrity of their election processes[.]" *Id*. at 19. "In order to protect that compelling interest, a state may enact generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process[.]" *Id*. at 19-20 (quotation marks and citation omitted).

> In sum, while a citizen's right to vote is fundamental, this right is not unfettered. It competes with the state's compelling interest in preserving the integrity of its elections and the Legislature's constitutional obligation to preserve

the purity of elections and to guard against abuses of the elective franchise, including ensuring that lawful voters not have their votes diluted. *Id*. at 20.

Our Supreme Court articulated the *Burdick* test as follows:

> [T]he first step in determining whether an election law contravenes the constitution is to determine the nature and magnitude of the claimed restriction inflicted by the election law on the right to vote, weighed against the precise interest identified by the state. If the burden on the right to vote is severe, then the regulation must be "narrowly drawn" to further a compelling state interest. However, if the restriction imposed is reasonable and nondiscriminatory, then the law is upheld as warranted by the important regulatory interest identified by the state. [*Id.* at 21-22.]

Moreover, the Court recognized that every election regulation "imposes to some degree a burden on an elector." *Id*. at 22.

In *In re Request for Advisory Opinion*, 479 Mich at 36, the Court held that the requirement that a voter provide photo identification before being provided a ballot did "not impose a severe burden on the right to vote" and imposed "only a reasonable, nondiscriminatory restriction" that furthered the state's "compelling regulatory interest in preventing voter fraud," and enforced the purity of elections provision set forth in Const 1963, art 2, § 4. Similarly, the received-by deadline for absentee ballots does not impose a severe restriction on the right to vote and is a reasonable, nondiscriminatory provision that "protect[s] the integrity and reliability of the electoral process." See *Anderson v Celebrezze*, 460 US 780, 788 n 9; 103 S Ct 1564; 75 L Ed 2d 547 (1983). This is particularly true considering that a voter is not required to mail his or her absentee ballot. Rather, the voter or an immediate family member may deliver the ballot in person to the city or township clerk, or, if requested, the clerk must pick up the ballot or send an election assistant to pick up the ballot. MCL 168.764a. Accordingly, the received-by deadline is not unconstitutional.

Plaintiffs next argue that the failure of local clerks to immediately process absentee-ballot applications within 40 days of an election violates Const 1963, art 2, § 4(1)(g). Initially, we note that the concept that a local clerk must "immediately" issue an absentee ballot is found in the provisions of MCL 168.761(1), which provides that a clerk must immediately forward a ballot upon receipt of the application or, if ballots are not yet available, as soon as the ballots are received. Defendant states in her brief that she has, in fact, advised local clerks to issue ballots within 24 hours of receipt of the application. While 24 hours is not literally "immediately" upon receipt, neither is it feasible, as defendant points out, to actually issue a ballot immediately upon receipt of the application as the application must be verified and the ballot prepared for mailing, as well as the fact that there may be a backlog of requests that must be processed.

Plaintiffs allege that in the March 2020 Presidential primary, some 402 townships failed to start mailing absentee ballots by the beginning of the 40-day period. They also refer to "some election clerks" in "prior elections" did not permit voters to cast their absentee ballots within the 40-day period. Even accepting these factual allegations as true, we fail to see what mandamus relief this Court can provide in the instant action. The Secretary asserts that she has discharged her legal duty to, in essence, direct local clerks to comply with the law. Given the lack of evidence

to the contrary, we accept the Secretary at her word. If a local election clerk has ignored or otherwise failed to comply with the Secretary's directions and the law, it would require a mandamus action against those clerks to force their compliance. But none of those clerks are before us, so we cannot at this time grant relief.

Finally, plaintiffs argue that requiring absentee voters to pay the return postage to mail an absentee ballot violates "[t]he right, once registered, to vote a secret ballot in all elections," set forth in Const 1963, art 2, § 4(1)(a), and the right to choose whether to submit an absentee ballot by mail set forth in Const 1963, art 2, § 4(1)(g).

Applying the *Burdick* test previously discussed, requiring absentee voters to pay for return postage does not impose a severe restriction on the right to vote. Rather, it is a reasonable, minimal, and nondiscriminatory restriction. Notably, Const 1963, art 2, § 4(1)(g), provides voters the right *to choose* to submit an absentee ballot by mail. It does not require that voters be permitted to submit absentee ballots at no cost. Every election regulation "imposes to some degree a burden on an elector." *In re Request for Advisory Opinion*, 479 Mich at 22. Considering the various options for submitting an absentee ballot, the requirement that a voter pay return postage is minimal.[21] To the extent that the cost of return postage may pose a financial hardship, the voter or an immediate family member may deliver the ballot in person, or, if requested, the city or township clerk must pick up the ballot or send an election assistant to pick up the ballot. MCL 168.764a.

For these reasons, we conclude that plaintiffs have failed to establish their entitlement to mandamus relief and the complaint for a writ of mandamus is denied. Defendant may tax costs.

/s/ David H. Sawyer

---

[21] Indeed, even the voter who chooses to vote in person will likely bear the cost of transportation to the polling place, except for those who live within walking distance.

-16-